v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0206–JV–439.

Court of Appeals of Indiana.

Jan. 29, 2003.

Janice E. Smith, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

C.T.S. was found to be a delinquent child by the Marion Superior Court because he committed the following offenses: pointing a firearm,[1] a Class A misdemeanor when committed by an adult, and bat-

---

1. Ind.Code § 35–47–4–3 (1998).

tery,[2] a Class A misdemeanor when committed by an adult. At the dispositional hearing, the trial court granted wardship of C.T.S. to the Department of Correction and recommended a period of commitment of twelve months. C.T.S. appeals raising seven issues, which we reorder and restate as:

I. Whether the trial court had personal jurisdiction over C.T.S.;

II. Whether the trial court erred when it denied C.T.S.'s request for access to a polygraph examiner while he was detained;

III. Whether C.T.S. was properly detained for over four months in the Juvenile Detention Center before he was adjudicated a delinquent child;

IV. Whether the trial court properly excluded C.T.S.'s stepfather from the proceedings due to a witness separation order;

V. Whether the evidence was sufficient to support the trial court's finding that C.T.S. committed the acts of pointing a firearm and battery, which are Class A misdemeanors if committed by an adult;

VI. Whether the trial court properly committed C.T.S. to the Department of Correction; and,

VII. Whether Indiana Code section 31–32–6–3 unconstitutionally removes from the trial court its authority to determine if the public should be excluded from a juvenile proceeding.

We affirm in part, reverse in part, and remand.

### Facts and Procedural History

The facts most favorable to the trial court's judgment reveal that on October 20, 2001, both C.T.S. and D.A.O. were at a party at the clubhouse at Martin Manor Apartments in Indianapolis. During a fight that occurred at the party, C.T.S. and D.A.O. yelled at each other using vulgar language. As D.A.O. was walking back to his car to leave after the party ended due to the fight, C.T.S. approached him. When D.A.O. arrived at his car, C.T.S. walked up, stood next to him and pulled out a gun. He then threatened D.A.O. and with his finger on the trigger, put the gun against D.A.O.'s stomach. Tr. p. 31. D.A.O. stated "don't you ever pull a gun out on me" and pushed it away. *Id.* While D.A.O. and C.T.S. yelled obscenities at one another, one of C.T.S.'s friends took the gun from him, and another friend pulled C.T.S. away from D.A.O. D.A.O. then left with his friends.

On October 22, 2001, at approximately 7:00 p.m., D.A.O. was at home when he heard a knock on the door. As he opened the door, the individual at the door asked D.A.O. if Rob lived there. D.A.O. replied in the negative and saw C.T.S. approach. After a short conversation, C.T.S. and the other individual grabbed D.A.O. and dragged him outside. D.A.O. observed that C.T.S. had something in his hand, which he thought was the "butt of a gun." Tr. p. 36. C.T.S. then hit D.A.O. with the object on his face near his eyebrow. D.A.O. collapsed and was punched and kicked repeatedly. A neighbor observed what was happening and called 911. D.A.O. was taken to St. Vincent's Hospital where he received stitches as a result of the blow to his face.

As a result of the two incidents, on November 1, 2001, C.T.S. was charged with pointing a firearm, a Class D felony if committed by an adult, and battery, a Class C felony if committed by an adult.[3]

---

2. Ind.Code § 35–42–2–1 (1998 & Supp.2002).

3. C.T.S. was also charged with criminal recklessness, a Class D felony if committed by an

An initial hearing was also held on that date, at which C.T.S. entered a denial as to both charges. The trial court ordered C.T.S. detained at the Marion County Juvenile Detention Center finding that C.T.S. "is unlikely to appear for subsequent proceedings and detention is essential to protect the child or the community." Appellant's App. p. 43. Also at the initial hearing, a denial hearing was scheduled for November 26, 2001.

On November 14, 2001, C.T.S. filed a notice of alibi defense and a request for visitation by an investigator and a polygraph examiner. The trial court granted the request for the investigator, but denied access to a polygraph examiner. On November 21, 2001, at a pretrial hearing, C.T.S. filed a motion for continuance, which was granted. The denial hearing was rescheduled for December 19, 2001. Also, on November 21, C.T.S. filed a motion requesting to be released from detention. The motion was denied.

On December 19, 2001, the trial court convened the denial hearing and evidence was heard. Due to time constraints, the trial court continued the denial hearing to January 3, 2002. Also on December 19, the trial court held a detention hearing and ordered C.T.S. to remain in detention. Evidence was heard at the January 3, 2002 denial hearing, but the hearing was continued for a second time due to time constraints. Another detention hearing was also held on that date, and the trial court found that C.T.S. should remain in detention.

The denial hearing was then continued twice on the court's own motion. On February 8, 2002, the denial hearing resumed, and the parties rested. On that date, a detention hearing was held as well, and the trial court ordered C.T.S. to remain in detention. After proposed findings of fact and conclusions of law were submitted by both parties, on March 8, 2002, the trial court issued its findings of fact and found C.T.S. to be a delinquent child. Also, on that date, C.T.S. filed another request for release from detention, which the trial court granted, and C.T.S. was released to his parents on electronic monitoring.

On April 15, 2002, a disposition hearing was held. At that time, the trial court found that C.T.S. was a delinquent child for pointing a firearm, a Class A misdemeanor if committed by an adult, and battery, a Class A misdemeanor if committed by an adult.[4] The trial court then granted wardship of C.T.S. to the Department of Correction and recommended a period of commitment of twelve months because of C.T.S.'s prior history of delinquent activity. The trial court also found that "its disposition is the least restrictive alternative to insure [C.T.S.'s] welfare and rehabilitation." Appellant's App. p. 5. C.T.S. now appeals. Additional facts will be provided as necessary.

## I. Personal Jurisdiction

■ C.T.S. first argues that the trial court lacked personal jurisdiction over him because a summons was not issued as required by Indiana Code section 31–37–12–2(b).[5] C.T.S. and his parents appeared at

---

adult, but this charge was dismissed with prejudice on January 3, 2002.

4. The pointing a firearm charge was reduced to a Class A misdemeanor because the State failed to prove that the gun was loaded. The battery charge was reduced to a Class A misdemeanor because the State failed to prove that the instrument causing injury was a deadly weapon.

5. Indiana Code section 31–37–12–2(b) provides that

the juvenile court shall set a time for the initial hearing. A summons shall be issued for the following:
(1) The child.
(2) The child's parent, guardian, custodian, or guardian ad litem.
(3) Any other person necessary for the proceedings.

the initial hearing held on November 1, 2001; therefore, they clearly had actual notice of the date and time of the initial hearing. In *K.D. v. State*, 754 N.E.2d 36, 40 (Ind.Ct.App.2001), our court held that the juvenile could not "successfully challenge the court's personal jurisdiction over him because he submitted himself to the authority of the juvenile court and did not challenge personal jurisdiction by filing a motion to dismiss." C.T.S. and his parents appeared at every hearing, did not challenge personal jurisdiction, and fully submitted themselves to the authority of the trial court. Under these facts and circumstances, the trial court had personal jurisdiction even though a summons was not issued as required by Indiana Code section 31–37–12–2(b).

## II. Access to a Polygraph Examiner

■ C.T.S. next argues that the trial court improperly denied his request for access to a polygraph examiner. Specifically, he alleges that the trial court's refusal to grant him access to a polygraph examiner prejudiced the preparation of his defense and violated his state and federal constitutional rights to counsel and due process of law.

■ In general, polygraph examinations are not admissible as evidence in Indiana because of their inherent unreliability. *Gray v. State*, 758 N.E.2d 519, 522 (Ind. 2001) (citations omitted). While C.T.S. acknowledges the restriction on the admissibility of such examinations, he contends that polygraph examinations can assist in the preparation of a defense and can be used in negotiations with prosecutors.

The State responds that C.T.S. has failed to demonstrate how a polygraph examination would have been essential to the preparation of his defense and observes that C.T.S.'s defense was well prepared. At the denial hearings, C.T.S. conducted lengthy cross-examinations of the State's witnesses and presented numerous witnesses on his own behalf.

We agree that C.T.S. has failed to specifically demonstrate how lack of access to a polygraph examination prejudiced his defense. Therefore, given Indiana's general rule that polygraph examinations are not admissible as evidence, the trial court did not err when it denied C.T.S.'s request for access to a polygraph examination.[6]

## III. C.T.S.'s Detention During the Juvenile Proceedings

■ C.T.S. next argues that the trial court abused its discretion when it detained him in the Marion County Juvenile Detention Center for over four months during the pendency of the proceedings. Initially, we note that the State argues that this issue is moot because if C.T.S. prevails on this argument, our court is not in any position to render effective relief to him. However, our courts "have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of 'great public interest.'" *R.A. v. State*, 770 N.E.2d 376, 378 (Ind.Ct.App.2002) (citation omitted). Issues that are likely to recur generally fall within the public interest exception. *Id.* This issue is one likely to recur, and therefore, we will address this issue on its merits.

Ind.Code § 31–37–12–2(b) (1998).

6. C.T.S. also argues that the rule regarding the admissibility of polygraph examinations that applies in criminal proceedings may not also apply to juvenile delinquency proceedings. However, polygraph examinations are inadmissible because of their inherent unreli-

ability, and this reasoning applies regardless of whether the proceedings involve adult criminals or juveniles. Furthermore, in delinquent child proceedings, procedures governing criminal trials apply in all matters not covered by juvenile law. *See* Ind.Code § 31–32–1–1 (1998).

Pursuant to Indiana Code section 31–37–6-6, a juvenile court is generally required to release a "child on the child's own recognizance or to the child's parent, guardian, or custodian upon the person's written promise to bring the child before the court at a time specified." Ind.Code § 31–37–6-6(a) (1998 & Supp.2002); *see also State ex rel. W.A. v. Marion County Superior Court, Juvenile Div.*, 704 N.E.2d 477, 479 (Ind.1998).

However, a juvenile court does have the authority to detain a child pending a fact-finding hearing if the court finds probable cause to believe the child is a delinquent child and that:

"(1) the child is unlikely to appear for subsequent proceedings;

(2) detention is essential to protect the child or the community;

(3) the parent, guardian, or custodian:

(A) cannot be located; or

(B) is unable or unwilling to take custody of the child; or

(4) return of the child to the child's home is or would be:

(A) contrary to the best interests and welfare of the child; and

(B) harmful to the safety or health of the child; or

(5) the child has a reasonable basis for requesting that the child not be released."

*W.R.S. v. State*, 759 N.E.2d 1121, 1123 (Ind.Ct.App.2001) (quoting Ind.Code § 31–37–6-6(a)). "If the court finds one of these conditions, it is allowed to impose detention before it holds any further proceedings." *Id.* (citing *State ex rel. W.A.*, 704 N.E.2d at 480).

At the initial hearing on November 1, 2001, the trial court ordered C.T.S. detained because "the Child is unlikely to appear for subsequent proceedings and detention is essential to protect the child or the community."[7] Appellant's App. p. 9. On November 21, 2001, at a pretrial hearing, C.T.S. filed a motion to continue the denial hearing scheduled for November 26, 2001, which was granted. The denial hearing was rescheduled for December 19, 2001. Also, on November 21, C.T.S. filed a motion requesting release from detention. During the detention hearing, C.T.S.'s mother informed the trial court that if C.T.S. was released to her care, an adult would always be present at home because in addition to herself and C.T.S.'s stepfather, she employed a nanny. Tr. p. 9. The motion was denied, and C.T.S. was ordered to remain in detention.

On December 19, 2001, in addition to a denial hearing, the trial court also held a detention hearing. At that hearing, C.T.S.'s stepfather informed the court of his extensive law enforcement background and that he would be willing to take a leave of absence from work to be at home with C.T.S. at all times. Tr. p. 89. The trial court ordered C.T.S. to remain in detention. The denial hearing was then continued to January 3, 2002 due to time constraints. On January 3, the denial hearing was held and continued due to time constraints for a second time, and C.T.S. again requested release from detention. The trial court denied the request.

Another denial hearing was scheduled for January 23, 2002, but it was then continued twice on the court's own motion. On February 8, 2002, the denial hearing resumed, and the parties rested. On that date, the trial court once again ordered C.T.S. to remain in detention. On March 8, 2002, C.T.S. filed another request for release from detention, which the trial court granted, and C.T.S. was released to his parents on electronic monitoring.

7. The trial court made this same finding with    every detention order issued thereafter.

We agree with C.T.S. that the trial court abused its discretion when it detained him for over four months during the pendency of these proceedings. There is ample evidence in the record demonstrating that C.T.S.'s parents were willing to go to great lengths so that C.T.S. could be released to their care while the proceedings were pending. Mother employed a nanny who would be available to supervise C.T.S. while Mother and Stepfather were at work. Also, Stepfather indicated that he was willing to take a leave of absence from work to be with C.T.S. at all times. Given the willingness of C.T.S.'s parents to provide adult supervision of C.T.S. at all times, which became evident to the trial court after the November 21, 2001 pretrial hearing, a less restrictive alternative, such as home detention, would have likely ensured C.T.S.'s appearance for subsequent proceedings and negated the need to detain C.T.S. for reasons of his protection or that of the community. Under these facts and circumstances, the trial court erred when it continued C.T.S.'s detention after the November 21, 2001 pretrial hearing.

## IV. Exclusion of C.T.S.'s Stepfather from the Proceedings

■ C.T.S. next argues that the trial court improperly excluded his stepfather from the proceedings because he was on his witness list. During the proceedings, the State moved for separation of the witnesses, and therefore, C.T.S.'s stepfather was excluded from the denial hearing held on December 19, 2001. When C.T.S. requested that his stepfather be permitted to remain in the courtroom, the trial court replied, "I need a parent here but not both." Tr. p. 15. C.T.S.'s stepfather was also excluded from the courtroom during the January 3, 2002 denial hearing. However, C.T.S. and his parents decided to forego any testimony from his stepfather prior to the February 8, 2002 denial hearing, and therefore, the stepfather was not excluded from the courtroom during that hearing.

C.T.S. argues that the circumstances in this case are similar to those in *L.B. v. State*, 675 N.E.2d 1104 (Ind.Ct.App.1996). In *L.B.*, the juvenile argued that his constitutional right to due process was violated when his parents were not permitted to be present and participate in his entire hearing due to a witness separation order. *Id.* at 1104. Citing Indiana Code section 31–6–4–9,[8] our court determined absent a valid waiver, exclusion of the parents was improper. *Id.* at 1107. However, the facts in this case are distinguishable from the facts in *L.B.* because one of C.T.S.'s parents, his mother, was allowed to remain in the courtroom. Additionally, C.T.S.'s stepfather was not excluded from each denial hearing, only those hearings held on December 19 and January 3. Under these facts and circumstances, where C.T.S.'s mother was present during each hearing, the trial court did not err when it excluded C.T.S.'s stepfather due to the witness separation order.

## V. Sufficiency of Evidence

■ C.T.S. next argues that the evidence was insufficient to support the trial court's finding that he committed the acts of pointing a firearm and battery, and therefore, the trial court's finding that he is a delinquent child must be reversed. Our standard of review is well settled:

> [W]hen the State seeks to have a juvenile adjudicated to be [a] delinquent child, the State must prove every element of that offense beyond a reason-

---

8. *See* now Indiana Code 31–37–10–7 (1998), which provides: "The (1) child; (2) child's parent, guardian, or custodian; and (3) prosecuting attorney; are parties to the proceedings described in the juvenile law and have all rights of parties provided under the Indiana Rules of Trial Procedure."

able doubt. Upon review, we will not reweigh the evidence or judge the credibility of the witnesses. Rather, this court looks to the evidence and the reasonable inferences therefrom that support the [true finding], and we will affirm a conviction if evidence of probative value exists from which the factfinder could find the defendant guilty beyond a reasonable doubt. Thus, we will affirm the finding of delinquency unless it may be concluded that no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt.

*J.V. v. State*, 766 N.E.2d 412, 415 (Ind.Ct. App.2002), *trans. denied* (internal citations omitted). In addition we note that "it is the function of the trier of fact to resolve conflicts in testimony and to determine the weight of the evidence and the credibility of the witnesses." *K.D. v. State*, 754 N.E.2d 36, 38 (Ind.Ct.App.2001) (citing *Jones v. State*, 701 N.E.2d 863, 867 (Ind. Ct.App.1998)).

### A. *Pointing a Firearm*

■ To find that C.T.S. had committed the act of pointing a firearm, the State was required to prove that C.T.S. knowingly or intentionally pointed a firearm at D.A.O. *See* Ind.Code § 35–47–4–3 (1998). At the denial hearing, D.A.O. testified that when he arrived at his car to leave the party, C.T.S. walked up, stood next to him and pulled out a gun. D.A.O. stated that C.T.S. threatened him and with his finger on the trigger, put the gun against D.A.O.'s stomach. Tr. p. 31. D.A.O. stated "don't you ever pull a gun out on me" and pushed it away. *Id.* D.A.O. testified that the gun was then taken from C.T.S. by one of his friends. The State also introduced the testimony of D.B., D.A.O.'s friend who witnessed the incident. D.B. testified that he saw a gun in C.T.S.'s possession as it was being taken from him. Tr. p. 110. This evidence is sufficient to support the trial court's finding that C.T.S.

committed the act of pointing a firearm, a Class A misdemeanor if committed by an adult.

■ C.T.S. argues that there are numerous inconsistencies between D.A.O.'s testimony and D.B.'s and their testimony was not credible. While there are some minor inconsistencies, such as who was in possession of the keys to D.A.O.'s car and where certain people were sitting in the car, D.B. unequivocally testified that he saw a gun as it was taken away from C.T.S. and gave a description of it. C.T.S. merely invites us to reweigh the credibility of the witnesses, which we will not do. *See J.V.*, 766 N.E.2d at 415.

### B. *Battery*

■ To find that C.T.S. had committed the act of battery, the State was required to prove that C.T.S. knowingly or intentionally touched D.A.O. in a rude, insolent, or angry manner, which resulted in bodily injury. *See* Ind.Code § 35–42–2–1 (1998 & Supp.2002). At the denial hearing, D.A.O. testified that he was at home when he heard a knock on the door. As he opened the door, the individual at the door asked D.A.O. if Rob lived there. D.A.O. replied in the negative and saw C.T.S. approach. After a short conversation, C.T.S. and the other individual grabbed D.A.O. and dragged him outside. D.A.O. observed that C.T.S. had something in his hand, which he thought was the "butt of a gun." Tr. p. 36. C.T.S. then hit D.A.O. with the object on his face near his eyebrow. D.A.O. collapsed and was punched and kicked repeatedly. A neighbor observed what was happening and called 911. D.A.O. was taken to St. Vincent's Hospital where he received stitches as a result of the blow to his face.

■ Once again, C.T.S. argues that D.A.O.'s testimony was not credible. As we stated above, we will not reweigh the

credibility of the witnesses.[9] *See J.V.*, 766 N.E.2d at 415. D.A.O.'s testimony is sufficient to support the trial court's finding that C.T.S. committed the act of battery, a Class A misdemeanor if committed by an adult.

## VI. Commitment to the Department of Correction

■■■■ C.T.S. next argues that the trial court abused its discretion when it granted wardship of C.T.S. to the Department of Correction and recommended a period of commitment of twelve months. C.T.S. contends that his commitment to the Department of Correction was punitive in nature, and the trial court should have selected the least restrictive alternative. "The choice of a specific disposition of a juvenile adjudicated a delinquent child is within the sound discretion of the juvenile court, subject to the statutory considerations of the welfare of the child, the community's safety, and the Indiana Code's policy of favoring the least harsh disposition." *E.H. v. State*, 764 N.E.2d 681, 684 (Ind.Ct.App.2002), *trans. denied* (citations omitted). We will not reverse a juvenile disposition absent a showing of an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.*

Initially, we note that the statutory scheme for dealing with juveniles who commit crimes is vastly different from the statutory scheme for sentencing adults who commit crimes. *Id.* (citing *In re G.B.*, 709 N.E.2d 352, 354 (Ind.Ct.App.1999)).

"'American society [has] rejected treating juvenile law violators no differently from adult criminals in favor of individualized diagnosis and treatment.'" *Id.* (quoting *In re G.B.*, 709 N.E.2d at 354 (quoting *State ex rel. Camden v. Gibson Circuit Court*, 640 N.E.2d 696, 697 (Ind.1994))). Indiana has a well-established policy of ensuring that "'children within the juvenile justice system are treated as persons in need of care, protection, treatment, and rehabilitation.'" *In re G.B.*, 709 N.E.2d at 354 (quoting Ind.Code § 31–10–2–1(5) (1998)).

In *Jordan v. State*, 512 N.E.2d 407 (Ind. 1987), our supreme court described the nature of the juvenile justice system as follows:

The nature of the juvenile process is rehabilitation and aid to the juvenile to direct his behavior so that he will not later become a criminal. For this reason the statutory scheme of dealing with minors is vastly different than that directed to an adult who commits a crime. Juvenile judges have a variety of placement choices for juveniles who have delinquency problems, ranging from a private home in the community, a licensed foster home, a local juvenile detention center, to State institutions such as the Indiana Boys School and Indiana Girls School. None of these commitments are considered sentences. A child can become a juvenile delinquent by committing acts that would not be a violation of the law if committed by an adult, such as incorrigibility, refusal to attend public school, and running away from home. A child can also become a delinquent by committing acts that would be a crime if

---

**9.** In his Reply Brief, C.T.S. argues for the first time that D.A.O.'s testimony was incredibly dubious. C.T.S. has waived this argument by failing to raise it in his Appellant's Brief. Any argument not presented in the original brief is waived, and a party may not revive it by arguing the issue in the reply brief. *Meyers v. Langley*, 638 N.E.2d 875, 879 (Ind.Ct.App. 1994).

committed by an adult. In the juvenile area, no distinction is made between these two categories. When a juvenile is found to be delinquent, a program is attempted to deter him from going further in that direction in the hope that he can straighten out his life before the stigma of criminal conviction and the resultant detriment to society is realized. In contrast, when an adult is convicted of a crime, the conviction is a stigma that follows him through life, creating many roadblocks to rehabilitation. In addition to the general stigma of being an "ex-con," or a felon, the conviction subjects him to being found a habitual criminal if he later commits additional felonies, and affects his credibility as a witness in future trials. The Legislature purposely designed the procedures of juvenile determinations so that these problems are not visited on those found to be juvenile delinquents in a juvenile court.

*E.H.,* 764 N.E.2d at 684–85 (quoting *Jordan,* 512 N.E.2d at 408–09).

■ A juvenile court has wide latitude and great flexibility in dealing with juveniles; however, its goal is to rehabilitate rather than to punish. *Id.* at 685. Indiana Code section 31–37–18–6 provides a list of factors that the juvenile court must consider in entering a dispositional decree. That statute specifically provides:

If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:

(1) is:

(A) in the least restrictive (most family like) and most appropriate setting available; and

(B) close to the parents' home, consistent with the best interest and special needs of the child;

(2) least interferes with family autonomy;

(3) is least disruptive of family life;

(4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and

(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

Ind.Code § 31–37–18–6 (1998).

In its dispositional order, the trial court found that "its disposition is the least restrictive alternative to insure [C.T.S.'s] welfare and rehabilitation." Appellant's App. p. 107. The trial court also incorporated into its dispositional order the findings and information contained in the pre-dispositional report. In that report, C.T.S.'s history of delinquent activity was detailed, including several acts which had occurred in 2000: 1) fleeing law enforcement; 2) disorderly conduct; 3) battery; and 4) criminal mischief. Appellant's App. pp. 88–89. The 2000 cases were consolidated, C.T.S. admitted to committing the acts, and was ordered to serve probation, which he completed. In addition, while C.T.S. was detained during the pendency of the proceedings which are the subject of this appeal, he tested positive for marijuana and received three critical incident reports. Appellant's App. p. 94. The recommendation in the 2002 pre-dispositional report is as follows:

Based on the youth's pattern of true findings, available information supporting a violent propensity, two separate true findings involving the same victim, and consideration of public safety, [c]ommitment to the Department of Correction is being recommended.

Appellant's App. p. 106.

C.T.S. argues that his commitment to the Department of Correction is punitive in nature and observes that he has never been adjudicated for an act that would be a felony if committed by an adult. He also notes that he has excelled academically

and in soccer while enrolled in a private high school and has a strong support system at home.

While we recognize that C.T.S. has excelled in certain areas of his life, we cannot ignore the evidence of his increasingly violent nature. C.T.S. pointed a firearm, and D.A.O., the victim, testified that C.T.S. verbally threatened to shoot him. Also, this case involved C.T.S.'s second battery adjudication, and this battery resulted in injury to D.A.O. severe enough to require stitches. Given the trial court's "wide latitude .and great flexibility in dealing with juveniles," *see E.H.*, 764 N.E.2d at 685, we cannot conclude that the trial court abused its discretion when it granted wardship of C.T.S. to the Department of Correction and recommended a period of commitment of twelve months.

## VII. The Constitutionality of Indiana Code section 31–32–6–3

■ Finally, C.T.S. argues that Indiana Code section 31–32–6–3, which opens juvenile proceedings to the public when the delinquent act alleged would be a felony if committed by an adult, is overbroad and removes from the trial court the authority to determine whether a juvenile proceeding is open to the public. However, C.T.S. failed to raise this argument in the trial court; therefore, it is waived. *See Van Winkle v. Nash*, 761 N.E.2d 856, 859 (Ind.Ct.App.2002) (failure to raise issue before trial court results in waiver of that issue).

## Conclusion

The trial court had personal jurisdiction over C.T.S. because he had actual notice of the proceedings. The trial court did not err when it denied C.T.S. access to a polygraph examiner and excluded his stepfather from the proceedings. In addition,

there was sufficient evidence to support the trial court's finding that C.T.S. committed the acts of pointing a firearm and battery, Class A misdemeanors if committed by an adult. The trial court also did not abuse its discretion when it granted wardship of C.T.S. to the Department of Correction and recommended a period of commitment of twelve months.

■ However, the trial court did err when it detained C.T.S. in the Marion County Juvenile Detention Center for over four months during the pendency of these proceedings. It is unclear from the record before us whether C.T.S. was given credit towards his recommended twelve-month commitment to the Department of Correction for that four-month period that he was detained. Therefore, we remand this case to the trial court to clarify its dispositional order to reflect that C.T.S. will be given credit for that period of detention against his recommended period of commitment.

Affirmed in part, reversed in part, and remanded.

BAILEY, J., concurs.

SULLIVAN, J., concurs in part and concurs in result in part with opinion.

SULLIVAN, Judge, concurring in part and concurring in result in part.

I fully concur as to Parts I, III, VI and VII.

With respect to Part II, I concur subject to a caveat. I find it difficult to understand how polygraph evidence is "inherently unreliable"[10] but that a stipulation by the parties cloaks the polygraph results with sufficient reliability to be admissible into evidence. I believe this to be a contradiction even though the trial court has

---

**10.** Very recently our Supreme Court has reiterated that the rule against admissibility is "because of the inherent unreliability of polygraph examinations." *Gray v. State*, 758 N.E.2d 519, 522 (Ind.2001).

discretion to disallow such evidence despite a stipulation if not satisfied as to the qualifications of the examiner or as to the conditions under which the test was administered. Absent a defect as to one or both of those factors, it would appear that the trial court must admit the polygraph results, thereby conferring reliability upon that evidence.

This view is reflected in Thomas K. Downs, *Admission of Polygraph Results: A Due Process Perspective*, 55 Ind. L.J. 158, 168 (1979–1980):

> "[T]he *Dorsey* court [*State v. Dorsey*, 88 N.M. 184, 539 P.2d 204 (1975)] may have perceived the anomalous position of a court which accepts evidence when both sides stipulate, or when the prosecution fails to object, but rejects the same evidence when offered by the criminal defendant absent the prosecution's waiver. Such a rule might well fail to withstand a *Chambers* [*Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)] scrutiny for legitimacy, since it arbitrarily rejects testimony considered sufficiently reliable to admit for the same purpose, if the state waives its objections."

Perhaps it is more accurate to state that a party who stipulates to such evidence loses the right to object to its admissibility. Yet the dilemma then arises as to how the jury is to be instructed in considering such evidence. Must it be viewed just as any other evidence? Or is it to be given a heightened degree of scrutiny as to its reliability?

Under the current state of the law we know only that a defendant is entitled to a limiting instruction *if he requests* such instruction. *Sanchez v. State*, 675 N.E.2d 306 (Ind.1996). In such event, the jury is to be instructed that:

> "at most, the [polygraph] examiner's testimony tends only to show whether the defendant was being truthful at the time of the examination, and that it is for the jury to determine the weight and effect to be given such testimony." *Id.* at 308.

The giving of such an instruction would certainly seem to confer a degree of reliability upon the results of polygraph examinations and thus seems to greatly dilute the usually phrased proposition that such results are inherently unreliable. Perhaps it is fair to say that polygraph examination results are not favored with respect to their admissibility, but I do not believe it is accurate to say that they are "inherently unreliable." [11]

Under Part IV, the majority affirms the exclusion of C.T.S.'s stepfather from the denial hearings of December 19 and January 3. In doing so, the decision distinguishes *L.B. v. State*, 675 N.E.2d 1104 (Ind.Ct.App.1996) upon grounds that in that case both parents were excluded and in the case before us C.T.S.'s mother was present at all times. My reading of *L.B.* does not lend itself to that distinction, for throughout the *L.B.* opinion the court repeatedly refers to the "parents" in the

---

11. The United States Supreme Court in *U.S. v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) by an eight to one vote refused to invalidate a *per se* exclusion of polygraph evidence in military criminal proceedings reasoning that the scientific community lacks consensus as to reliability. A five-person majority, however, concluded that such evidence does not diminish the jury's role in determining credibility and that the jury remains fully able to competently decide the factual question of guilt. Be that as it may, the *Scheffer* decision extensively discusses the divergent scientific views concerning the reliability of polygraph examinations. Compare majority opinion by Justice Thomas, 523 U.S. at 309–11, 118 S.Ct. 1261, with the separate concurrence by Justice Kennedy, 523 U.S. at 318, 118 S.Ct. 1261, joined by Justices O'Connor, Ginsburg and Breyer, and with the dissent by Justice Stevens, 523 U.S. at 333–35, 118 S.Ct. 1261.

plural and with regard to their rights. The statutory scheme indicates that both parents are true parties to the proceeding. If that is so, they both have a right to be present absent some overriding consideration to the contrary.[12] In my estimation such overriding consideration is present in the case before us and constitutes a valid exception to the normal rights of both parents to be present. So long as one parent is present for all proceedings, in light of the witness separation order, the inclusion of the stepfather upon the witness list trumps his individual right to be present. I agree, however, that the majority opinion correctly carves out this exception.

Subject to the observations above, I concur.

---

**12.** That Mr. D. is the stepfather of C.T.S. rather than the natural father is not a significant or meaningful basis to hold the exclusion appropriate. He is in *loco parentis* and has custody and control of the juvenile. I cannot conceive that in such situations the legislature intended that a stepparent be excluded from proceedings involving the stepson.