# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 04 2018, 8:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.K.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

December 4, 2018

Court of Appeals Case No.
18A-JV-1702

Appeal from the Hamilton
Superior Court

The Honorable Steven R. Nation,
Judge

Trial Court Cause No.
29D01-1806-JD-799

**Tavitas, Judge.**

## Case Summary

J.K., a minor, appeals his adjudication as a delinquent for an act that would be considered intimidation if committed by an adult, a Level 6 felony. We affirm.

## Issues

J.K. makes several arguments on appeal, which we consolidate and restate as follows:

> I. Whether there was sufficient evidence to adjudicate J.K. as a delinquent for an act that would be considered intimidation if committed by an adult, a Level 6 felony.
>
> II. Whether the juvenile court erred in detaining J.K. during the pendency of the action.
>
> III. Whether the juvenile court erred in committing J.K. to the Department of Correction for ninety days as a result of his adjudication.

## Facts

J.K. was a sixteen-year-old student at Carmel High School. During the 2017-2018 school year, J.K.'s English teacher was A.H. ("Ms. H."). In his first quarter, J.K.'s grades were "high Bs." Tr. Vol. II p. 36. In his second quarter, J.K.'s grades slipped slightly as he turned in assignments late and sometimes not at all. On at least one occasion in the second quarter, Ms. H. approached J.K. about his failure to timely complete his assignments. J.K. did not seem "super concerned" when Ms. H. approached him. *Id.* at 37. At the end of the third quarter, J.K.'s grades were around a C or a C+.

[4]     At the end of the third quarter, J.K. approached Ms. H. and asked her to change his grade from a C+ to a B+. Ms. H. declined to do so. Thereafter, J.K began acting very strangely toward Ms. H. and would not speak to her in class. When J.K. had a question, he would "just write it down on a piece of paper and hand it to [Ms. H.]." *Id.* at 48. Ms. H. ultimately referred J.K. to the school counselor because J.K. would not speak to her. By the end of the fourth quarter, J.K. was failing Ms. H.'s English class.

[5]     J.K. again later approached Ms. H. and was upset that Ms. H. was "failing him." *Id.* at 38. On the Friday before his fourth quarter final exams, J.K. came into Ms. H.'s classroom and asked Ms. H. if she "want[ed him] to fail?" *Id.* Ms. H. responded that she did not want J.K. to fail, but that Ms. H. wanted J.K. to turn in his assignments on time so he could pass. J.K. then stormed out of the classroom.

[6]     A few days later, on May 30, 2018, J.K. again approached Ms. H. in her classroom to return a book he borrowed during the school year. After J.K. left the classroom, Ms. H. noticed that there was a large envelope sticking out of the book J.K. had just placed on her desk. Ms. H. opened the envelope and found a typed letter. The typed letter included the following:

> [Ms. H.,] I want you to do me a favor and not grade my writing
> in this letter to you. This letter will explain how I feel about you.
> You have been a fine teacher. As a person you are amazing. I
> really like you as a person but I hate you as a teacher. A small
> piece of advice please quit your job because I know you will
> make more money in other jobs. If I had my own company I

would hire you and pay minimum 100K. Teaching is not your thing. Remember this is what I think about you not others. I did not like you as a teacher since the beginning of third quarter. Being honest you are the best "teacher" I had in my schooling career. I forgot my middle school English teacher's names but I will never forget you in my life. The reason I won't forget you is because you made into my death list. Don't worry there are only 3 people and you are the last person. You are the only teacher I have been mad at my entire life.

* * * * *

Like I don't know if you treat each student differently like idk because I am brown and have [sic] Indian accent you hate me or something. And like you like students who had similar taste as you like music or movies. I really don't know if you treat your student differently or not. Like for some reason I have never been so mad at a teacher in my life like I have been at you. Again you are the best as a person. I act different in front of my other teachers. Like I don't even ask a single question in my fashion class and like won't even talk to my teacher.

* * * * *

I think you won't get like this kind of letters at the end of the year but I am really sorry for how I behaved in the class. I was like super mad at u on friday like I wished something really bad should happen to you. I actually prayed to god something bad should happen to you but unfortunately something happened in the westfield middle school and I came to know your kids go there. I was f***ing mad at you. I was preparing a contract like how to destroy your life by the time I am 35. I told to my friends and they said if I give that to you I will be in huge trouble. I don't know if you hate me or not but I hate you as a f***ing teacher. But as a person you are f***ing amazing. You are cool

and you have so much like soooooooo much patience. You never get mad at us and your just amazing as a person. Idk if u hate me for my skin colour or something but I don't like to be brown.

* * * * *

And you are the only teacher in my life that send [sic] me to a f***ing counselor, when my counselor was talking to me I was like thing [sic] about like this is stupid and I felt like one of those goth or those weirdos who cut them self. I felt very uncomfortable. Please do me a favor don't report me to the counselor that will just make you look like a jerk. This [sic] my feeling and I was totally honest with you. I was not like one of those people who will say you are the best teacher I had in my life and say bull s***. I am sorry if I had any grammar mistakes. I could have said this in person but I thought that u hate my accent and it is annoying to hear it. Hope you understand. Idk if this is your number [Ms. H.'s phone number] but if I want to talk in the future I will give you a call. If that is not yours at least I am able to reach you with this number [Ms. H. husband's phone number]. Please don't go and report this if you have any questions just talk to me. If not goodbye for rest of your life. Wait I forgot to say that one of my goals in my life is to like get revenge on you. The only thing I hate is your profession so I might just be after that. You are a great person. Just talk to me if you got any questions. This is my number [*********]. Thanks so much for talking your time to read this bulls*** letter.

Appellant's App. Vol. II pp. 22-23.[1]  The handwritten portion of the note finished with: "from the most hated student of yours" and was signed by J.K. *Id.* at 23.[2]

[7]  After reading the letter, Ms. H. reported it to her mentor teacher.  Ms. H. and her mentor teacher then discussed the letter with the assistant principal, Toby Steele.  After reading the letter, Steele went to find J.K. and questioned him about the letter.  J.K. indicated that he wrote the letter and intended Ms. H. to read it.  J.K. hoped that Ms. H. would "see [the letter], read it, and then ultimately talk to [J.K.] about it." Tr. Vol. II p. 53.  Steele also attempted to determine the other names on J.K.'s alleged "death list." *Id.* at 55.

[8]  J.K. informed Steele that he first became upset with Ms. H. on May 17, 2018, and the next morning, J.K. created the "contract" that J.K. mentioned in his letter to Ms. H.  Ms. H. had no knowledge of this contract until days later when she received J.K.'s letter.  J.K. admitted he wrote the contract outlining his plans to "ruin" Ms. H., but intended to destroy the contract after one of J.K.'s classmates saw the contract and told J.K. he would get in trouble if someone found the contract. *Id.* at 53.  J.K. had not yet destroyed the contract, and

---

[1] All grammar, spelling, punctuation, and errors in the original.

[2] The reference to Ms. H.'s phone number in the letter was correct.  Ms. H.'s husband's phone number was wrong by one digit.

Steele found it in J.K.'s bookbag. J.K. claimed that he never intended Ms. H. to receive the contract.

[9] The contract was handwritten and made statements as follows: "[b]y the time I am 35 which is September 16, 2036. If I don't destroy your life personal, [professionally] and social, I will give up all my net worth to you." Appellant's App. Vol. II p. 24 (all spelling, grammar, and punctuation in the original). The contract's aims included: "destroy[ing]" Ms. H.'s relationship with her "family parents, husband, kids," "[Ms. H.'s] job, identify. . . ," "friends . . . , [and] place in society." *Id.* J.K. listed "8 ways to destroy a person" which included "fame," "smartness," "power," "emotion," "strengths," "money," "morality," and "death." *Id.* The contract stated, "the only way you can break the contract is public apology so the rest of the world can see it. And public be humiliated . . . ." *Id.*

[10] J.K. was taken into custody on May 30, 2018, and placed in secure detention. The State alleged J.K. was delinquent for committing an act that would be intimidation if committed by an adult, a Level 6 felony under Indiana Code Sections 34-45-2-1(a)(2) and 35-45-2-1(b)(1)(B) ("Count I"), and for committing an act that would be intimidation if committed by an adult, a Level 6 felony, under Indiana Code Sections 35-42-2-1(a)(1) and 35-45-2-1(b)(1)(A) ("Count II").

[11] The juvenile court held a detention hearing on June 1, 2018. At the detention hearing, the juvenile court noted its receipt of J.K.'s preliminary inquiry report

and J.K.'s juvenile detention report. J.K.'s lawyer stated that J.K. wished to remain at home with his father and that J.K.'s father would "ensure that the child remain[ed] appropriately supervised during the course and pendency" of the proceedings. *Id.* at 6. J.K. is a first-time offender.

[12] The juvenile court ordered that detaining J.K. during the proceeding was "essential to protect the community from the child." *Id.* at 8. On June 18, 2018, the juvenile court held the detention review hearing. Testimony at the review hearing indicated that, prior to detention, J.K. lived with his father, and J.K.'s mother was in India. J.K.'s father worked approximately two and one-half miles from home. J.K.'s father testified at the hearing that he would take measures to ensure that J.K. was properly supervised if released from detention. Specifically, J.K.'s father offered to install security cameras in his home to watch his son during the day while J.K.'s father was at work. In the alternative, J.K.'s father stated that he would try to work from home so that he could maintain supervision over J.K.; however, J.K.'s father had not asked his employer about that option. J.K.'s father also stated he would disconnect the phone and internet in the home so J.K. would not have access to it.

[13] At the conclusion of the detention review hearing, J.K.'s attorney asked that J.K. be released to his father's care and custody. The juvenile court ordered that J.K. remain in detention. The juvenile court stated:

> Having read the risk assessment and having read the letter attached to the Juvenile Detention Report, I'm concerned about many things, but primarily the fact that your client is denying any

> intent to intimidate or instill fear in his teacher by writing this letter causes this Court grave concern about your client's thinking and judgment. So at this time he'll be remanded back to secure detention.

*Id.* at 20.

[14] The juvenile court conducted the fact finding hearing on July 3, 2018. At the fact finding hearing, Ms. H. testified regarding the events that took place when she received the letter. Ms. H. testified that she was "terrified," "shaking," and "really, really scared." *Id.* at 41.

[15] The juvenile court found that the State had proven beyond a reasonable doubt that J.K. committed Count I, an act which would be intimidation if committed by an adult, a Level 6 felony. Accordingly, the juvenile court entered an adjudication for delinquency. The probation department recommended that J.K. be placed on formal probation for twelve months, with possible early release after nine months, if all special conditions were completed and fees were paid. The probation department also recommended that J.K. be placed in secure detention for ninety days with the detention suspended, followed by electronic house arrest for sixty days, followed by thirty days on parental house arrest. Finally, the probation department recommended that J.K. follow the recommendations of the psychological evaluation, complete thirty hours of community service work, and have no contact with Ms. H. or her family.

[16] The State moved for a commitment of wardship to the Department of Correction ("DOC"). The juvenile court concluded:

> Any reasonable person reading this letter, and I believe the
> evidence bears out that [J.K] absolutely intended for [Ms. H.] to
> be put in fear by the reading of that letter. And to the extent that
> [J.K.] did not believe that, that demonstrates to this Court that
> there is a severe deficit in his thinking under these circumstances
> . . . . This was a communication that required research on his
> part, deliberateness on his part, aforethought on his part, and it
> included not only [Ms. H.], but her children, her husband, and
> was written under the umbrella of revenge.

Tr. Vol. II pp. 81-82. The juvenile court went on to conclude:

> The Court is further concerned that this letter does refer to a
> contract. Petitioner's Exhibit 2. And in this contract one of the
> ways expressed to destroy a person is by death, leaving it to [Ms.
> H.] to decide whether or not or based upon her compliance with
> [J.K.'s] demands [J.K.] would have that inflicted upon her. The
> only escape is for her to apologize for what she has done to [J.K.]
> through public humiliation. The Court finds this to be just very
> disturbing as to [J.K.'s] mental health, and I am not believing
> that the Juvenile can be rehabilitated safely within the
> community. The Court certainly is well aware that among the
> dispositional alternatives available to the Court that the
> legislature provided a broad array of dispositional alternatives, so
> that the Court in appropriate cases can determine the best
> rehabilitation for a juvenile, keeping in mind the best interest of
> the juvenile and the safety of the community.

*Id.* at 82.

[17] The juvenile court determined that it was in the best interest of J.K. and the
public for J.K. to become a ward of the DOC because:

it will allow [J.K.] to receive treatment for mental health issues that are clearly revealed in this situation within a secure setting that will preserve the safety of the community and impress upon [J.K.] as well the criminal nature of his actions, and an understanding that this is an action that cannot be repeated.

*Id.* Finally, the juvenile court found that "[J.K.'s] expression that [the way] for him to help himself is by telling other people what he has done falls woefully short in what this Court would envision is necessary for him to rehabilitate his thinking and understand the nature of his situation." *Id.* at 83. Specifically, when asked if J.K. believed his letter was alarming, J.K. stated:

Yes, sir. But I would like to say two things. One, thanks for her family because she had to put up with that and because of her family and what they've done, I have changed. Second, I can't say sorry because I learned you can't say sorry, but you can prove to a person how you can be sorry to physical actions. So the only way I can prove my sorry is going to other people and telling what I have done.

*Id.* at 73. At the end of the proceeding, the State moved to dismiss Count II. The juvenile court granted wardship of J.K. to the DOC for a period not to exceed ninety days.

## Analysis

### A. Sufficiency of the Evidence

[18] J.K. argues that the evidence was insufficient because the State failed to prove beyond a reasonable doubt that J.K. threatened Ms. H. and failed to prove beyond a reasonable doubt that J.K. intended to place Ms. H. in fear through

the letter. In addition, J.K. argues that, because he was a young teenager with external pressures and stressors related to his grades, he was not capable of realizing that his words would be perceived as threats.[3]

[19] When reviewing the sufficiency of the evidence in a juvenile adjudication, "we do not reweigh the evidence or judge witness credibility." *B.T.E. v. State,* 108 N.E.3d 322, 326 (Ind. 2018) (citing *K.S. v. State,* 849 N.E.2d 538, 543 (Ind. 2006)). "We consider only the evidence favorable to the judgment and the reasonable inferences supporting it." *Id.* "We will affirm a juvenile-delinquency adjudication if a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt." *Id.* (citing *Moran v. State,* 622 N.E.2d 157, 159 (Ind. 1993)).

[20] Indiana Code Section 35-45-2-1 provides:

> (a) A person who communicates a threat to another person, with the intent
>
> * * * * *
>
>      (2) that the other person be placed in fear of retaliation for a prior lawful act . . .
>
> * * * * *

---

[3] We appreciate the stressors that a teenager might feel when faced with the prospect of telling a parent about a bad grade; however, we find that the juvenile court took this consideration into account because J.K. was adjudicated a delinquent and did not face charges in criminal court.

commits intimidation, a Class A misdemeanor.

The offense is a Level 6 felony if the person to whom the threat is communicated "is an employee of a school or school corporation . . . ." Ind. Code § 35-45-2-1(b)(1)(B)(iii). J.K.'s offense would be considered intimidation if committed by an adult, a Level 6 felony, because Ms. H. was his teacher at an Indiana public school.

[21] The statute defines "threat" as the following:

> "Threat" means an expression, by words or action, of an intention to:
>
> > (1) unlawfully injure the person threatened or another person, or damage property;
> >
> > (2) unlawfully subject a person to physical confinement or restraint;
> >
> > (3) commit a crime;
> >
> > (4) unlawfully withhold official action, or cause such withholding;
> >
> > (5) unlawfully withhold testimony or information with respect to another person's legal claim or defense, except for a reasonable claim or witness fees or expenses;
> >
> > (6) expose the person threatened to hatred, contempt, disgrace, or ridicule;

> (7) falsely harm the credit or business reputation of the person threatened; or
>
> (8) cause the evacuation of a dwelling, a building, another structure, or a vehicle.

Ind. Code § 35-45-2-1(d).

[22] First, we disagree with J.K. that he did not communicate a "threat" as defined in Indiana Code Section 35-45-2-1(d). J.K. told Ms. H. that she was on his death list. Although J.K. now contends that the "death list" reference came from a television show, this was not communicated in the letter and there is no indication in reading the letter this is the case. Second, J.K. explicitly stated that he wanted to "get revenge" on Ms. H. Appellant's App. Vol. II p. 34. This court finds irrelevant, even if true, that J.K. later attempted to add a caveat to his threat that he "might" only be out to cost Ms. H. her job. *Id.* The references to "death" and "revenge" are sufficient to meet the statute's requirement and constitute threats. *Id.* at 33-34. We decline to address J.K.'s contention that other statements in the letter are not threats. The State presented sufficient evidence for the juvenile court to find J.K. threatened Ms. H.[4]

---

[4] Because we find that the juvenile court had sufficient evidence to find intimidation based upon just the letter itself, we do not address J.K.'s argument that "not only had J.K. not communicated the contract to his teacher he did not intend to communicate the contract." Appellant's Br. p. 20.

[23] Second, there was sufficient evidence that J.K. intended to place Ms. H. in fear. J.K. made clear in the letter that he knew how to contact Ms. H.—if not by Ms. H.'s phone number, then by her husband's number. In addition, J.K.'s reference to "revenge" could reasonably lead a fact finder to conclude that J.K. intended to place Ms. H. in fear of some action by J.K. Ms. H. also indicated that she was actually in fear. She stated:

> I kind of thought that he was maybe even going to go into an apology because of how he had acted previously, but then it got really, really scary. He said he had a death list, he said I was on it. Then on the second page is when I really started to get scared when he mentioned the school shooting with [sic] both of my children attend Noblesville so that really, really freaked me out. Then he started to say he hated me, he wanted to get revenge on me. It was scary. And then at the end he had my husband and I's [sic] phone numbers both in there and I didn't know how he got those.

Tr. Vol. II p. 40.

[24] J.K.'s letter also instructs Ms. H. not to tell anyone about the letter—which indicates that J.K. understood the likelihood that Ms. H. would report this letter to law enforcement officials. J.K.'s psychological evaluation indicated J.K.'s intent to place Ms. H. in fear. J.K. stated he desired to get a reaction out of Ms. H. and wanted Ms. H. to talk to J.K. about the letter. The evidence clearly supports the fact that J.K. knew this letter would place Ms. H. in fear and he, indeed, did place Ms. H. in fear.

[25] J.K. cites *Brewington v. State* to support his argument that, so long as J.K. was not communicating a "true threat," his speech should be constitutionally protected. Appellant's Br. p. 35. The *Brewington* court held that "true threats under Indiana law include two elements: (1) that the speaker intended his communications to put his targets in fear for their safety; and (2) that the communications were likely to actually cause fear in a reasonable person similarly situated to the target." *Brewington v. State,* 7 N.E.3d 946, 964 (Ind. 2014). As in *Brewington,* we find that there is more than "ample evidence on both points" as discussed above. *Id.*

[26] We also agree with the *Brewington* court that "[f]ear for one's *reputation* is often the price of being a public figure, or of involvement in public issues. But fear for one's *safety* is not." *Id.* (emphasis supplied). We do not believe that J.K.'s statements—specifically regarding revenge—are entitled to constitutional protection. J.K.'s arguments attempt to minimize the gravity of the situation. Because J.K. was communicating a true threat, his speech is not constitutionally protected speech.

[27] We also reject J.K.'s argument that, perhaps, he was simply responding to a perceived racial bias against him. The State presented significant evidence that J.K.'s anger towards Ms. H. derived from his poor grades. The psychological evaluation of J.K. also indicated that "[t]he following Tuesday at school [J.K.] was reminded of his anger [towards Ms. H.] when talking with a classmate who mentioned his own poor grade in the same English class. Emotions were stirred as he remembered his intense anger the week prior and a wish that his

teacher would experience 'something bad.'" Appellant's App. Vol. II p. 44. The evidence, thus, supports the conclusion that J.K. was responding to a poor grade and not a perceived bias against him.

[28] J.K. threatened his teacher because he did not get what he wanted—a changed grade. We find there was sufficient evidence for the juvenile court to adjudicate J.K. as a delinquent for an act that would be considered intimidation if committed by an adult, a Level 6 felony.

### B. Detention

[29] J.K. also contends that the juvenile court abused its discretion in detaining J.K. during the pendency of the action. J.K. was detained for approximately one month prior to his adjudication. The juvenile court stated it detained J.K. because J.K. did not acknowledge that he intended to place Ms. H. in fear by writing the letter.

[30] J.K. cites *C.T.S.* to support his argument. *See C.T.S. v. State,* 781 N.E.2d 1193, 1198 (Ind. Ct. App. 2003), *trans. denied.* In *C.T.S.,* as J.K. explains, "this Court held that it was an abuse of discretion for a court to hold a child during the pendency of the proceeding where the parents gave assurances that they would go to great lengths so that C.T.S. could be released to their own care while the proceedings were pending." Appellant's Br. p. 42. *C.T.S.* is distinguishable from this case. In *C.T.S.,* both parents lived in the home with the minor, and it appeared C.T.S.'s mother had already employed a nanny to supervise C.T.S. during the day. *See C.T.S.,* 781 N.E.2d at 1198. Here, J.K.'s mother was in

India, and J.K.'s father worked full time. Although J.K.'s father did acknowledge that he was willing to take additional measures to ensure he could supervise J.K. regularly, J.K.'s father had not yet inquired about the leave of absence at his place of employment, and the security cameras he offered to use to supervise J.K. remotely were not yet in place. We find the cases distinguishable on these facts alone.

[31] Regardless, the State argues that this point is moot, and we agree. While there may be some level of public interest in this case, it does not overcome the mootness. *See In re F.S.,* 53 N.E.3d 582, 590 (Ind. Ct. App. 2016) ("Indiana courts have long recognized that a moot case may nevertheless be decided on its merits under an exception to the general rule when the case involves questions of 'great public interest'" which "typically contain issues likely to recur.") (citing *C.T.S.,* 781 N.E.2d at 1198). "Issues that are likely to recur generally fall within the public interest exception." *C.T.S.,* 781 N.E.2d at 1198 (citing *R.A. v. State,* 770 N.E.2d 376, 378 (Ind. Ct. App. 2002)). J.K.'s situation is very unique and is not likely to occur again. Therefore, we decline to address J.K.'s argument on this point as it is moot.

### C. Disposition

[32] J.K. argues that the juvenile court abused its discretion when it granted wardship of J.K. to the DOC for ninety days. "The juvenile court has discretion in choosing the disposition for a juvenile adjudicated delinquent." *D.E. v. State,* 962 N.E.2d 94, 96 (Ind. Ct. App. 2011) (citing *L.L. v. State,* 774 N.E.2d 554, 556 (Ind. Ct. App. 2002), *reh'g denied*). "The discretion is subject

to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition." *Id.* "We may overturn [J.K.'s] disposition order only if the court abused its discretion." *Id.* "An abuse of discretion occurs when the juvenile court's judgment is clearly against the logic and effect of the facts and circumstances before it, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.*

[33] Indiana Code Section 31-37-18-6 states:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
>> (A) in the least restrictive (most family like) and most appropriate setting available; and
>>
>> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

[34] J.K. argues that his placement was an abuse of discretion because of the evidence that: (1) J.K. is a "good student" who had an "uncharacteristic fall in grades and wrote a harsh letter to his teacher"; (2) J.K. "does not fit the mold" of a child who requires the harshest dispositional alternative; (3) J.K. "had never been in trouble before"; and (4) J.K.'s offense would have been a Class A misdemeanor if he had written the letter to anyone but his teacher. Appellant's Br. p. 51.

[35] Our court addressed a similar argument in *J.B. v. State.* While J.B. had a history of delinquency unlike J.K., J.B. made a similar argument regarding the "least restrictive means." 849 N.E.2d 714, 717 (Ind. Ct. App. 2006). A panel of our court noted the following:

> This argument, however, fails to consider the portion of the statute we have emphasized above—that the trial court is only required to consider the least restrictive placement *if* that placement comports with the safety needs of the community and the child's best interests. I.C. § 31-37-18-6. We conclude that the trial court did not abuse its discretion by committing J.B. to the DOC because the less-restrictive placement suggested by J.B. would have fallen short of meeting the community's safety needs.

*Id.* at 717-18. So too, here, does J.K.'s argument fall short. The juvenile court is only required to consider the least restrictive placement if the juvenile court determines that the least restrictive placement is consistent with the safety of the community. The juvenile court did not believe that to be the case here. The mere fact that there were less restrictive placement options available to the juvenile court does not entitle J.K. to relief.

[36] Here, the juvenile court placed J.K. in the DOC so that J.K. could participate in ongoing mental health treatment and to ensure that it would be clear to J.K. he could not repeat such conduct. We find this to be consistent with the goal that, "[w]hen a juvenile is found to be delinquent, a program is attempted to deter him from going further in that direction in the hope that he can straighten out his life before the stigma of criminal conviction and the resultant detriment to society is realized." *D.E.,* 962 N.E.2d at 97 (citing *Jordan v. State,* 512 N.E.2d 407, 408-09 (Ind. 1987)).

[37] In *R.A. v. State,* a panel of our court found that the trial court abused its discretion when it granted wardship to the DOC for a juvenile who had been adjudicated delinquent for committing an act that would constitute public indecency and who had attempted suicide during the pendency of the proceeding. 936 N.E.2d 1289, 1289 (Ind. Ct. App. 2010). In reversing the juvenile court's placement to the DOC, our court noted that "[s]everal mental health experts testified that placement in a secure residential treatment facility would be in R.A.'s best interests and consistent with the safety of the community." *Id.* at 1291. There was testimony from several mental health professionals that R.A.'s "social and emotional issues have been significantly impaired by several disorders, including one that is on the autism spectrum; generalized anxiety disorder; and attention deficit hyperactivity disorder." *Id.* at 1290 (internal citations omitted). There was no such testimony in this case that would warrant a finding that the juvenile court abused its discretion in sending J.K. to the DOC.

[38]    We emphasize our supreme court's conclusion that "[t]he nature of the juvenile process is rehabilitation and aid to the juvenile to direct his behavior so that he will not later become a criminal." *Jordan v. State,* 512 N.E.2d 407, 408-09 (Ind. 1987), *reh'g denied,* 516 N.E.2d 1054 (1087).  While we believe not every juvenile court may have reached the same result, namely, that the DOC was the best placement for J.K. based on the circumstances, this is not our inquiry.  Instead, we focus on whether this juvenile court, with its broad discretion, abused that discretion.  We find that the juvenile court here did not abuse its discretion in committing J.K. to the DOC for ninety days based on the record before it.

## Conclusion

[39]    For the foregoing reasons, we find that the juvenile court had sufficient evidence to adjudicate J.K. as a delinquent for an act that would be considered intimidation if committed by an adult, a Level 6 felony.  We decline to address whether the juvenile court abused its discretion in detaining J.K., as this issue is moot.  Finally, we find that the juvenile court did not abuse its discretion in committing J.K. to the DOC for ninety days.  We affirm.

[40]    Affirmed.

Brown, J., and Altice, J., concur.