

FILED

May 12 2016, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Matthew J. McGovern<br>Anderson, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Robert J. Henke<br>James D. Boyer<br>Deputy Attorneys General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of F.S., T.W., M.F., and B.F. (*Minor Children*)<br><br>  and<br><br>B.S. (*Mother*),<br><br>*Appellant-Respondent,*<br><br>      v.<br><br>Indiana Department of Child Services for Crawford County,<br><br>*Appellee-Petitioner.* | May 12, 2016<br><br>Court of Appeals Case No.<br>13A01-1505-JM-363<br><br>Appeal from the Crawford Circuit Court<br><br>The Honorable Kenneth Lynn Lopp, Judge<br><br>Trial Court Cause No.<br>13C01-1503-JM-18<br>13C01-1503-JM-19<br>13C01-1503-JM-20<br>13C01-1503-JM-21 |

**Robb, Judge.**

# Case Summary and Issue

[1] B.S. ("Mother") appeals the trial court's order, based on authority granted by Indiana Code section 31-33-8-7, compelling her to allow the Crawford County Department of Child Services ("DCS") to interview two of her children. She contends the statute is unconstitutional as applied to her because it allowed the trial court to compel the interviews based solely on the uncorroborated accusations of an undisclosed informant, violating her substantive and procedural due process rights. Concluding the statute as applied in this case violated Mother's right to raise her family free from undue interference by the State, we reverse.

# Facts and Procedural History[1]

[2] B.S. ("Mother") is the mother of four children, T.W., F.S., M.F., and B.F. (the "Children"). D.F. ("Father") is the father of the two youngest children. Mother, Father, and all four children live in a trailer in Crawford County. At the time of the following events, Mother was on probation for a theft conviction. In addition, the household had a history with the Crawford County Department of Child Services ("DCS"), including a child in need of services

---

[1] We heard oral argument in Indianapolis on January 20, 2016. We thank counsel for their informative oral presentations.

("CHINS") case that had been closed in early January of 2015. *See* Appellant's Appendix at 15 (showing prior DCS contacts in 2007, 2011, and 2014).

[3] On March 2, 2015, an unnamed source[2] contacted DCS to report possible abuse or neglect of the Children. Specifically, the caller reported incidents of domestic violence between Father and Mother occurring in the presence of the children; daily drug use and possible drug dealing by both Father and Mother; an unsafe home environment; and multiple school absences by F.S. *See id.* at 14-15.

[4] Brenda Hogan, a DCS family case manager, initiated an assessment by making a home visit. Mother and two of the Children were home at the time. Hogan toured the house and did not see any evidence of drugs or signs of drug use in Mother. The home was appropriate and the Children appeared healthy and safe. Hogan's visit was cut short when she asked Mother to take a drug screen and Mother declined, indicating she wanted to call her lawyer first. After a subsequent meeting between Hogan and Mother at Mother's lawyer's office, and after Father completed a drug screen that was clean, the assessment was classified as unsubstantiated and closed. *See* Transcript at 30, 33.

[5] On March 17, 2015, an unnamed source contacted DCS twice to report possible abuse or neglect of the Children. The caller reported Mother and Father use drugs three times a week and buy drugs in the presence of the Children,

---

[2] It appears the source was known to DCS but was not disclosed to Mother or to the trial court.

including as recently as the day before. The caller also reported that incidents of domestic violence between Father and Mother had occurred as recently as February or March of 2015.[3] In response, Hogan initiated a new assessment.

[6] On the same date, the Crawford County Probation Department received an anonymous tip that Mother was using methamphetamine. James Grizzel, the county's chief probation officer, checked the "Pseudo logs" and discovered that Mother had recently bought the maximum allowable amount of pseudoephedrine and had done so on a monthly basis going back "at least the last couple months." Tr. at 54, 60. Grizzel therefore decided to conduct a home visit.

[7] Hogan, Grizzel, and a police officer went to Mother's home together. Mother refused entry to Hogan, but allowed Grizzel and the officer to enter. Mother, Father, and three of the Children were home. Grizzel looked around the home—both inside and out—and although he confiscated alcohol from the refrigerator and saw dusty roach clips pinned to a bulletin board, he saw no indications of recent drug use or manufacturing, and neither Mother nor Father appeared to be under the influence of alcohol or drugs. Father had just had a drug screen less than a week before, so Grizzel did not request another sample

---

[3] Hogan testified there was a specific allegation that F.S. saw Mother hit Father in the head and that domestic violence had occurred multiple times. *Id.* at 25. She further testified there were also allegations that F.S. had issues with anger and Mother was driving without a driver's license. *Id.* None of this appears on the two March 17 preliminary reports of child abuse or neglect included in the record as Exhibits A and B to a motion filed by DCS. It appears there may have been a back side or second page to the reports that was not copied, either as part of the exhibit originally or as part of the appendix later.

from him, but he did request Mother submit to a drug screen. Mother provided a urine sample on site but Grizzel rejected it based on color and temperature and told Mother that she would have to provide a supervised sample at his office. That screen came back clean. Grizzel described the house as being "in good shape." *Id.* at 58. Based upon what Grizzel and the officer told her about the condition of Mother, Father, the Children, and the house that day, Hogan affirmed she was "satisfied that there wasn't any evidence of drug use in the house or on [Mother] and that the children were safe." *Id.* at 36. In addition, Hogan testified she had not since "found any evidence to verify any of the information that was given . . . by this report source." *Id.* at 37.

[8]     Nonetheless, on March 17, 2015,[4] DCS filed a Motion to Control the Conduct of Mother and Father. The motion noted two reports were received by DCS on March 17, 2015, "that may constitute an instance of child abuse and/or neglect, in that there may be substance abuse and domestic violence in the home," and further noted that in order for Hogan to complete a thorough assessment, "she would need an interview with [Mother], [Father], and the children." Appellant's App. at 18-19. DCS requested a hearing be held and, following the hearing, an order be entered requiring Mother and Father "to comply with an interview" with DCS. *Id.* at 19.[5] A hearing was originally scheduled for March

---

[4] The motion is actually file-stamped March 16, 2015, but references the March 17 reports to DCS and has a certificate of service dated March 17, 2015. Appellant's App. at 18-19.

[5] At this time there was already a pending motion to control the conduct of Father, referencing the March 2 report, seeking an order for him to submit to an interview and a drug screen. *Id.* at 12-13.

26, and notice was given to both Mother and Father. The hearing was ultimately not held until April 7, 2015.

[9]     In the meantime, an additional report was made to DCS on March 31, 2015. The caller reported that Father had purchased and used drugs over the weekend; Mother was using drugs; both were selling drugs from the house; there were further incidents of domestic violence in the presence of the Children; and Father had inappropriately disciplined one of the Children. Lana Tobin, a DCS family case manager, conducted the assessment on this report. She visited the home on April 1, 2015. Mother, Father, and the three youngest Children were home; the oldest child was at school. Tobin was able to enter the home to look around, and she saw the three Children. She was also able to see the oldest child at a later date. The Children were clean and appropriate and the home environment appeared safe. She saw no evidence of domestic violence and no evidence of drug use. Mother did refuse to take a drug screen at that time, however. Tobin testified that because "one of the main things is that they are buying and using[,] drug screens would be helpful, . . . but other than that, I didn't have any real concerns." Tr. at 47. During the hearing, Tobin summarized her visit:

> Q: [F]rom what you saw, not only did you not see any evidence of those [things that were reported], you were satisfied that those things just weren't true?
> A: Right, I had no evidence at that time.
> * * *
> Q: So once again, what we want the Judge to know, not only did you not see any evidence, the accusations were false from what

you saw?
A: Correct.

Tr. at 51-52.[6]

[10] At the hearing on April 7, 2015, Hogan, Tobin, Grizzel, and Mother all testified. Mother reaffirmed her refusal to consent to the Children being interviewed by DCS. At the conclusion of the hearing, Mother's counsel stated to the court her position supporting the refusal:

> First of all, I've already mentioned the statute [Ind. Code § 31-33-8-7] itself. It just says the Court may [grant the motion to interview the child] . . . . Here's the problem with this statute, Judge, it's like no other thing that we have. In that, I think what has to be read in the statute is some quantum of evidence for you to order the children to be interrogated . . . . Once again, I'll recognize [DCS's] interest in protecting kids, but if there's no evidence that children need protected, I don't think you have the right to [issue the order].

*Id.* at 68-70. In response, DCS argued:

> In this case, [DCS's] position is that interviewing the children will best allow us to confirm or deny the allegations that are contained in these reports. It's a mischaracterization to say that these children are going to be interrogated. They are going to be asked about mommy's drug use and whether daddy beats them. They will be asked in an age appropriate manner what is going

---

[6] Mother believes the multiple reports have been made by her sister, who disapproved of Mother's relationship with Father. *See* Tr. at 64 (Mother reading a text message from her sister the day of Tobin's visit stating "move away from the trailer and I will quit. I will keep doing it until you move to mom's. . . . I want the kids to be safe and they aren't safe with him, you know that").

on in their home. . . . None of this will be, will traumatize the children and that is why we're asking that these children be allowed to be briefly interviewed by [DCS] in order to close out these allegations and decide whether these are unsubstantiated reports.

*Id.* at 72-73.

[11] On April 20, 2015,[7] the trial court issued an order granting DCS's request to interview the two oldest children.[8] The order states only that the court grants the DCS request "after being duly and sufficiently advised in the premises." *Id.* at 36. At Mother's request, the trial court allowed her five days to file a Notice of Appeal, but if she did not do so, DCS was allowed to proceed with the interviews. Mother timely filed her Notice of Appeal and on May 19, 2015, the trial court granted her request for a stay pending appeal.

# Discussion and Decision

## I. Applicable Law

[12] When DCS receives a report of suspected child abuse or neglect, it "shall initiate an appropriately thorough child protection assessment . . . ." Ind. Code § 31-33-8-1(a). "The primary purpose of the assessment is the protection of the

---

[7] The order is actually dated March 20, 2015, but a subsequent nunc pro tunc entry corrected the date. Appellant's App. at 36, 37.

[8] The trial court issued an order the same day granting DCS's earlier request to order Father to submit to a drug screen. *Id.* at 35.

child." Ind. Code § 31-33-8-6. Indiana Code section 31-33-8-7 delineates the requirements for DCS's assessment, stating, in its entirety:

(a) The department's assessment, to the extent that is reasonably possible, *must* include the following:

(1) The nature, extent, and cause of the known or suspected child abuse or neglect.

(2) The identity of the person allegedly responsible for the child abuse or neglect.

(3) The names and conditions of other children in the home.

(4) An evaluation of the parent, guardian, custodian or person responsible for the care of the child.

(5) The home environment and the relationship of the child to the parent, guardian, or custodian or other persons responsible for the child's care.

(6) All other data considered pertinent.

(b) The assessment *may* include the following:

(1) A visit to the child's home.

(2) An interview with the subject child.

(3) A physical, psychological, or psychiatric examination of any child in the home.

(c) If:

(1) admission to the home, the school, or any other place that the child may be; or

(2) permission of the parent, guardian, custodian, or other persons responsible for the child for the physical, psychological, or psychiatric examination;

under subsection (b) cannot be obtained, the juvenile court, upon good cause shown, shall follow the procedures under IC 31-32-12.

(d) If a custodial parent, a guardian, or a custodian of a child refuses to allow the department to interview the child after the caseworker has attempted to obtain the consent of the custodial parent, guardian, or custodian to interview the child, the department *may* petition a court to order the custodial parent, guardian, or custodian to make the child available to be interviewed by the caseworker.

(e) If the court finds that:

(1) a custodial parent, a guardian, or a custodian has been informed of the hearing on a petition described under subsection (d); and

(2) the department has made reasonable and unsuccessful efforts to obtain the consent of the custodial parent, guardian, or custodian to interview the child;

the court shall specify in the order the efforts the department made to obtain the consent of the custodial parent, guardian, or custodian and *may grant the motion to interview the child*, either with or without the custodial parent, guardian, or custodian being present.

(Emphasis added.) Upon completion of an assessment, the initial report shall be classified as substantiated or unsubstantiated. Ind. Code § 31-33-8-12.

[13] A petition seeking to order a parent to make a child available for an interview by DCS is also governed by Indiana Code chapter 31-32-13, which addresses juvenile court procedures generally and the issuance of orders specifically. A juvenile court may issue an order "to control the conduct of any person in relation to the child" upon the motion of, among others, a caseworker or the attorney for DCS. Ind. Code § 31-32-13-1(1). The juvenile court must give notice to any person whose conduct will be regulated by such an order to appear at a specific date and time for a hearing. Ind. Code § 31-32-13-3; *see also* Ind. Code § 31-33-8-7(e)(1). "The court shall issue an order under section 1 of this chapter if the court finds that good cause to issue the order is shown upon the record." Ind. Code § 31-32-13-4. An order issued under chapter 31-32-13 remains in effect for one year, although it may be extended for additional one year periods upon an annual review, or may be modified or dissolved at any time upon a showing that the original circumstances of the order have changed or new circumstances have developed. Ind. Code § 31-32-13-6.

## II. Is Mother's Appeal Moot?

[14] As a threshold issue, the State argues we should dismiss this appeal as moot. At Mother's request, the trial court stayed its order compelling her to submit the Children to a DCS interview pending the outcome of this appeal. In its Brief of Appellee, the State alleged it had learned Mother was arrested on July 18, 2015,

after testing positive for methamphetamine and amphetamine, and she signed a consent for DCS to interview the children on that date. The Children were adjudicated CHINS on September 17, 2015, after Mother admitted that due to her arrest, she was incarcerated and unable to provide care and supervision of the Children.[9] The State filed an Appendix of Appellee with documents allegedly supporting these statements. Based on these events occurring subsequent to the filing of this appeal, the State asserts Mother has now consented to DCS interviews with the Children, and accordingly, the very action she challenges in this appeal has presumably already taken place. The State requests this appeal be dismissed because there is no relief we can grant to Mother.

[15] An appeal or issue is deemed moot when no effective relief can be rendered to the parties before the court. *DeSalle v. Gentry*, 818 N.E.2d 40, 48-49 (Ind. Ct. App. 2004). When the controversy at issue has been disposed of in a manner that renders it unnecessary to decide the question presented, the case will usually be dismissed. *Id.* at 49.[10] However, Indiana courts have long recognized that a moot case may nevertheless be decided on its merits under an

---

[9] The State also noted it had advised Mother's appellate counsel of these developments when it became aware of them shortly before filing its brief. Mother's appellate counsel had not been alerted by Mother's trial counsel or the trial court of these events and learned of them for the first time from the State. *See* Reply Brief of Appellant at 3 n.1.

[10] Our supreme court has noted that although Article III of the United States Constitution "limits the jurisdiction of federal courts to actual cases and controversies, the Indiana Constitution does not contain any similar restraint." *In re Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991). Therefore, while moot cases are *usually* dismissed, they are not *required* to be dismissed.

exception to the general rule when the case involves questions of "great public interest." *C.L.Y. v. State*, 816 N.E.2d 894, 900 (Ind. Ct. App. 2004), *trans. denied*. Cases falling within the public interest exception typically contain issues likely to recur. *C.T.S. v. State*, 781 N.E.2d 1193, 1198 (Ind. Ct. App. 2003), *trans. denied*. In addition, an appeal may be heard which might otherwise be dismissed as moot where leaving the judgment undisturbed might lead to negative collateral consequences. *Hamed v. State*, 852 N.E.2d 619, 622 (Ind. Ct. App. 2006). This is because "it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequence of the disability itself for an indefinite period of time." *In re Marriage of Stariha*, 509 N.E.2d 1117, 1123 (Ind. Ct. App. 1987) (quoting *Sibron v. New York*, 392 U.S. 40, 57 (1968)).

[16] Mother contends we should address the merits of this appeal. First, she notes the document on which the State relies to prove Mother consented to an interview with the Children is not a proper part of the record on appeal and should not be considered.[11] Although it is generally true that we may not consider matters outside the record on appeal, *Schaefer v. Kumar*, 804 N.E.2d 184, 187 n.3 (Ind. Ct. App. 2004), *trans. denied*, we have also noted that the

---

[11] Indiana Appellate Rule 2(E) defines the "Clerk's Record" to consist of "the Chronological Case Summary (CCS) and all papers, pleadings, documents, orders, judgments, and other materials filed in the trial court . . . or listed in the CCS." Rule 2(L) defines the "Record on Appeal" to consist of the Clerk's Record "and all proceedings before the trial court . . . whether or not transcribed or transmitted to the Court on Appeal." Mother notes that the "Consent of Parent, Guardian, or Custodian to Interview Child(ren)" submitted by the State does not contain a cause number linking it to these cases and does not appear to have been filed in the trial court, as it bears no file stamp and does not appear in the CCS for these cases. *See* App. of Appellee at 1.

parties should inform the appellate court "of a post-judgment change in circumstances which might render a pending appeal moot," *Cunningham v. Hiles*, 402 N.E.2d 17, 20 (Ind. Ct. App. 1980) (opinion on reh'g).

[17] Nonetheless, even if we accept the State's additional evidence, we decline the State's invitation to dismiss the case as moot and agree with Mother that this case involves a matter of constitutional proportions and is of great public interest.[12] Mother's claim of constitutional infringement on her right to raise her children rests on the premise that Indiana Code section 31-33-8-7 allows the trial court to compel any objecting parent to make his or her child available to DCS for an interview without any evidence that such an interview is necessary. Mother contends the same or similar thing may happen to other parents and is likely to evade review. The trial court in this case granted a stay to allow Mother to appeal its order, but time is often of the essence in cases dealing with possible threats to the welfare of children, and a stay in each case to allow for individual review is not a certainty.[13] Although a reversal might not afford

---

[12] Mother also claimed the appeal should be considered because of possible negative collateral consequences given that the order remained in effect for a year after issuance and could be used to compel further interviews with the Children. *See* Reply Br. of Appellant at 4-5; *see also* Ind. Code § 31-32-13-6. After the oral argument in this case, Mother filed a Notice to the Court informing us that on January 19, 2016, the day before oral argument, the State had filed in the trial court a motion to dismiss this cause and the trial court had granted the motion on January 21, 2016. Generally, once an appeal is perfected, the trial court loses jurisdiction over the case and orders issued by the trial court thereafter are void. *In re N.H.*, 866 N.E.2d 314, 317 n.3 (Ind. Ct. App. 2007). The trial court's order, going to the heart of the issue before us, is void and of no effect, *Crider v. Crider*, 15 N.E.3d 1042, 1064 (Ind. Ct. App. 2014), *trans. denied*, and therefore does not impact our decision.

[13] A similar case, discussed in greater detail below, has been before this court within the past three years. *In re A.H.*, 992 N.E.2d 960 (Ind. Ct. App. 2013), *trans. denied*. In that case, the trial court entered an order compelling the mother to produce her children for an interview with DCS within ten days and denied the mother's request for a stay pending appeal. Judge Riley, writing in dissent and noting the trial court denied a

Mother any relief given subsequent events, a decision on the merits will offer direction to courts in future cases where DCS seeks an order compelling an interview.

## III. Is Section 31-33-8-7 Unconstitutional as Applied?

### A. Standard of Review

[18] The Fourteenth Amendment guarantees both procedural and substantive due process rights. *McIntosh v. Melroe Co., a Div. of Clark Equip. Co.*, 729 N.E.2d 972, 975 (Ind. 2000). Procedural due process ensures that a party will be given notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* To determine whether a constitutional violation has occurred, we ask what process was provided and whether it was constitutionally adequate. *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). Substantive due process "declares some actions so outlandish that they cannot be accomplished by any procedure." *McIntosh*, 729 N.E.2d at 975. It ensures that state action is not arbitrary or capricious regardless of the procedures used. *Honeycutt v. Ong*, 806 N.E.2d 52, 58 (Ind. Ct. App. 2004). "An arbitrary and capricious decision is one which is patently unreasonable. It is made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion." *City of Indianapolis v.*

---

stay, concluded in the absence of any evidence to the contrary that the children had already been interviewed and would have dismissed the mother's appeal as moot because no effective relief could be granted. *Id.* at 968-69.

*Woods*, 703 N.E.2d 1087, 1091 (Ind. Ct. App. 1998), *trans. denied*. To state a claim for a violation of substantive due process, a party must show that the law infringes upon a fundamental right or liberty interest deeply rooted in our nation's history or that the law does not bear a substantial relation to permissible state objectives. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); *N.B. v. Sybinski*, 724 N.E.2d 1103, 1112 (Ind. Ct. App. 2000), *trans. denied*.

[19] As relevant to this case, the United States Supreme Court has held "the sanctity of the family" is protected "precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977). The Due Process Clause therefore protects freedom of personal choice in family life matters. *In re T.H.*, 856 N.E.2d 1247, 1250 (Ind. Ct. App. 2006); *see also E.P. v. Marion Cnty. Office of Family & Children*, 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) ("Indeed, the courts of this state have long and consistently held that the right to raise one's children is essential, basic, more precious than property rights, and within the protection of the Fourteenth Amendment . . . ."). This includes a parent's fundamental right to raise his or her child without undue interference by the state. *In re T.H.*, 856 N.E.2d at 1250. The right is not unlimited, however, and the State has the authority under its *parens patriae* power to intervene when parents neglect, abuse, or abandon their children. *Id.*

[20] In general, laws that burden the exercise of a fundamental right receive the strictest scrutiny. *Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.*, 643

N.E.2d 331, 337 (Ind. 1994); *see also G.B. v. Dearborn Cnty. Div. of Family & Children*, 754 N.E.2d 1027, 1031 (Ind. Ct. App. 2001) ("Because [Appellants] have a fundamental right to family integrity, we must strictly construe the challenged statute."), *trans. denied.* Under the strict scrutiny standard, a statute must serve a compelling state interest and be narrowly tailored to serve that interest. *Crafton v. Gibson*, 752 N.E.2d 78, 91 (Ind. Ct. App. 2011).

## B. Order on Motion to Interview

[21]     Mother does not argue Indiana Code section 31-33-8-7 is unconstitutional on its face, as she concedes it may be applied constitutionally. *See* Br. of Appellant at 9. Instead, she argues it is unconstitutional as applied to her, because the trial court issued an order under the statute compelling her to submit her children for an interview with DCS without any evidentiary showing of need. In doing so, she acknowledges this issue has already been decided adversely to her position by another panel of this court. *See id.* at 11 (citing *A.H.*, 992 N.E.2d at 966-67). But she argues this panel should reconsider the holding in *A.H.*, especially in light of the Seventh Circuit's decision in *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), and hold that an order compelling an interview under Indiana Code section 31-33-8-7 can only be issued if there is at least reasonable suspicion of child neglect or exigent circumstances.

[22]     For its part, the State concedes Mother has a fundamental due process right to raise her children without undue interference by the State. It argues, however, that the trial court's application of Indiana Code section 31-33-8-7 did not

violate Mother's substantive or procedural due process rights because the trial court's order was issued after an evidentiary hearing and was a proper exercise of the State's *parens patriae* power to intervene to protect the welfare of the children. The State urges us to adopt the reasoning of *A.H.* and hold the trial court's order granting DCS's petition to interview the Children pursuant to Indiana Code section 31-33-8-7 did not violate Mother's due process rights.

[23] The facts of *A.H.* are very similar to the facts here: DCS received a report the mother was selling heroin and prescription drugs, was using methamphetamine and heroin on a daily basis in the presence of her three children, and there were syringes all around the house. DCS initiated an assessment, and a family case manager made a home visit. She interviewed the mother, who stated she had no history of drug use other than prescribed medications. The mother submitted to a drug screen which came back negative for all drugs except those she was prescribed, and the case manager observed no signs the mother was impaired or under the influence of drugs. The case manager walked through every room in the house and saw no evidence of drug use or dealing. The one child who was present at the time of the visit appeared healthy, but the case manager did not speak with him due to his age. The mother indicated the father of one of her children had made a previous false report to DCS and she believed he may have done so again. Nonetheless, the case manager indicated that as part of the assessment, she needed to speak to the two older children, who were at school at the time of her visit. The mother declined to grant permission for the case manager to speak with the children. At some point after

the visit, DCS spoke with the father of one of the mother's other children, who reported the mother had a history of drug abuse, but he had not seen her in months and did not know if she was currently using drugs.

[24]  Two weeks after the home visit, DCS filed petitions to interview the two oldest children. The mother opposed the petitions on due process grounds. At the hearing, the case manager affirmed she had been trained and had experience in recognizing signs of daily drug use. When asked if the evidence she observed during the home visit failed to substantiate the allegations of the report, she replied that it did, "[a]t that point." 992 N.E.2d at 962 (alteration in original) (citation omitted). The trial court acknowledged the mother's argument about her fundamental right to direct the upbringing of her children was "compelling[]," but found DCS also had a compelling interest in protecting the welfare of children and had no means other than an interview to directly assess the conditions of the children as directed by statute. *Id.* at 962-63. The trial court granted the DCS' request to interview the children and the mother appealed. *Id.* at 963.

[25]  The mother argued on appeal that Indiana's statutory scheme, which permitted the trial court to order her to surrender her children for an interview in the absence of evidence demonstrating the children were being abused or neglected, was contrary to her right to due process. The court recognized that when determining whether a given procedure affords a litigant proper process, it must balance three factors: 1) the private interests affected by the proceeding; 2) the risk of error created by the chosen procedure; and 3) the countervailing

governmental interest supporting use of the challenged procedure. *Id.* at 966. The court noted the mother's interest in the care, custody, and control of her children and DCS's interest in protecting the welfare of the children are both substantial. *Id.* However,

> [w]hile we recognize the fundamental right of a parent to raise her child without undue interference by the state, we cannot say that due process requires DCS to conduct an assessment or a portion of an assessment in order to obtain information which would provide a basis supporting the accuracy or reliability of the report, prior to interviewing the child or children. Indeed, an interview of the child or children as part of this initial evaluation may provide the information needed for DCS to classify a report as substantiated or unsubstantiated. . . . [W]e cannot say that the risk of error created by the legislature's chosen procedure in Ind. Code § 31-33-8-7 or the actions of DCS or the trial court in this case is substantial or favor reversal in this case.

*Id.* at 967. Accordingly, the court affirmed the trial court's order granting the DCS petition to interview the children. *Id.* at 968.

[26] Mother argues we should reconsider *A.H.* because it conflicts with a Seventh Circuit Court of Appeals opinion holding that child abuse investigators violated the constitutional rights of a child and his parents when they conducted a custodial interview of the child without the parents' consent in the absence of any evidence giving rise to a reasonable suspicion that the child was being abused. *Heck*, 327 F.3d at 524. For several reasons, however, we find it unnecessary to turn to *Heck* to resolve the issue before us.

[27] First, there are significant factual, procedural, and legal distinctions between *Heck* and this case which make *Heck*'s utility for our purposes questionable at best. *Heck* originates from Wisconsin. The *Heck* court summarized the facts as follows:

> Several weeks after learning that administrators of the Greendale Baptist Church and Academy used corporal punishment as a form of discipline in primary grade school, caseworkers for the Bureau of Milwaukee Child Welfare initiated an investigation for child abuse. Over the objection of the Academy's principal, and without a warrant or parental notification or consent, the caseworkers removed eleven-year-old John Doe Jr. from his fourth-grade classroom and interviewed him about corporal punishment that he and other students may have received and certain family matters. Thereafter, the caseworkers unsuccessfully attempted to interview John Jr.'s parents and sister, and threatened to remove the Doe children from their parents' custody. The caseworkers also attempted, on a separate occasion, to interview other students at the Academy, whom John Jr. had identified as having been spanked, but the principal at the school flatly refused to grant them access to the children without a court order or parental consent. The Bureau eventually ended its investigation due to lack of information, and the Academy and parents filed suit against three child welfare caseworkers, in both their individual and official capacities, alleging that the manner in which they handled the investigation violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

*Id.* at 499. Although there are several significant factual differences between *Heck* and this case, we mention just two: in *Heck*, the allegation was that a third party was abusing the child by using corporal punishment; there was no allegation that the *parents* were abusing or neglecting the child other than the

caseworkers' belief that they might be "complicit" in the abuse because they presumably knew of the school's corporal punishment policy and did not prevent their child from being spanked. *See id.* at 502. Here, the reports were that Mother and Father were themselves abusing and/or neglecting their Children. Moreover, in *Heck*, the interview with the child was completed without his parents' knowledge, let alone consent; here, Mother had full knowledge of the desired interview and exercised her prerogative to decline to give her consent.

[28] Procedurally, the plaintiffs in *Heck* brought a Section 1983[14] claim against the caseworkers, individually and in their official capacities. The defendants asserted qualified immunity, and the district court granted their motion for summary judgment. In order to determine whether qualified immunity shielded the defendants from liability for the plaintiffs' constitutional claims, the reviewing court first had to determine whether the facts alleged showed the conduct by the caseworkers violated a constitutional right at all. Although it concluded that some of the actions taken by the defendants were unconstitutional, it also concluded that the defendants were entitled to qualified immunity and affirmed the district court decision. *See id.* at 499. Here, we are addressing the propriety of a trial court's action in prospectively granting a

---

[14] 42 U.S.C. § 1983.

motion that would allow the caseworkers to conduct an interview rather than retroactively reviewing actions already taken.

[29] Legally, the statute under which the caseworkers in *Heck* conducted their investigation provides that upon receiving a report from which there is reason to suspect child abuse or neglect, the appropriate agency shall initiate a diligent investigation to determine if the child is in need of protection and services. Wis. Stat. § 48.981(3)(c)(1)(a) (1997). Under certain circumstances, "the investigation shall also include observation or an interview with the child, or both, and, if possible, an interview with the child's parents, guardian or legal custodian." Wis. Stat. § 48.981(3)(c)(1)(b) (1997).

> The agency may contact, observe or interview the child at any location without permission from the child's parent, guardian or legal custodian if necessary to determine if the child is in need of protection or services, except that the person making the investigation may enter a child's dwelling only with permission from the child's parent, guardian or legal custodian or after obtaining a court order to do so.

*Id.* Mother asserts the Wisconsin statute and the Indiana statute are "identical in all meaningful, relevant respects" and "cannot be meaningfully distinguished," Br. of Appellant at 14, although she does acknowledge a "significant" difference, *id.* at 17: Indiana's statute does not allow DCS to seize a child and conduct an interview without either parental consent or a court order, whereas Wisconsin's statute requires neither. This, the State argues, "is a very big difference." Brief of Appellee at 11 n.7. Unlike the statute addressed

in *Heck*, the Indiana statute requires notice to the parent and a hearing before a court order may be issued compelling a parent to make his or her children available for an interview. *See* Ind. Code §§ 31-32-13-2 and -3. We agree with the State that the Wisconsin statute is not similar to Indiana's statute in any relevant way, and therefore a decision made under the Wisconsin statute is inapposite to a decision applying the Indiana statute.

[30] Second, in addition to the dissimilarities between this case and *Heck*, Seventh Circuit Court of Appeals cases are not binding on Indiana state courts. *Ind. Dep't of Pub. Welfare v. Payne*, 622 N.E.2d 461, 468 (Ind. 1993) (noting that "lower federal court decisions may be persuasive but have non-binding authority on state courts"). Mother acknowledges this, but nonetheless urges us to consider *Heck* persuasive authority serving as a basis for "reconsidering" *A.H.*, which "clearly authorizes a trial court to issue an order under Ind. Code § 31-33-8-7 absent a showing of any evidence by the DCS." Br. of Appellant at 23. *A.H.* is a Court of Appeals decision, however, and we do not recognize horizontal stare decisis in Indiana. *See In re C.F.*, 911 N.E.2d 657, 658 (Ind. Ct. App. 2009) (stating "each panel of this Court has coequal authority on an issue"). Therefore, although we are respectful of the panel's decision in *A.H.* and have given consideration to that opinion and its reasoning as we assess the

facts and circumstances presented by this case, we are not bound by it. *See id.* In short, we write upon a clean slate.[15]

[31] As noted above, parents have a constitutional right to raise their children without undue interference and the State has a valid, compelling interest in protecting those same children, though its interest does not rise to the level of a fundamental right. *See In re T.H.*, 856 N.E.2d at 1250. Essentially, we are asked to determine what standard of evidence is enough to tip the balance toward the State's interest and justify compelling the parent to act in a manner inconsistent with his or her right to control the family. Mother seeks to impose a Fourth Amendment-like standard on a court order issued pursuant to Indiana Code section 31-33-8-7; that is, she asserts such a court order should only be issued if supported by, if not probable cause, at least reasonable suspicion. Mother does not claim that the Children cannot be interviewed under any circumstances; rather, she asserts that an order compelling interviews over her objection was inappropriate on this record. The State asserts that imposing an evidentiary threshold of reasonable suspicion or probable cause before an order

---

[15] We also note that the State agreed at oral argument that *A.H.* did not specifically address this particular point, that is, what the standard of evidence for an order under section 31-33-8-7 is. *See* https://mycourts.in.gov/arguments/default.aspx?id=1898&view=detail (beginning at 24:40).

compelling an interview can be granted is contrary to good public policy and would interfere with the State's interest in protecting the welfare of children.[16]

[32]    Indiana Code section 31-33-8-1 provides that DCS *shall* initiate an "appropriately thorough" assessment of *every* report of child abuse or neglect it receives.  Ind. Code § 31-33-8-1(a).  Such an assessment *must* include certain things, Ind. Code § 31-33-8-7(a), and *may* include an interview with the child, Ind. Code § 31-33-8-7(b)(2).[17]  If DCS attempts to obtain the consent of the parent to conduct an interview with the child and the parent refuses, DCS *may* petition the court to order the parent to make the child available.  Ind. Code § 31-33-8-7(d).  The court *may* issue such an order, after a hearing, if the court "finds that good cause to issue the order is shown upon the record."  Ind. Code § 31-32-13-4; *see also* Ind. Code § 31-32-13-1 (providing the court *may* issue an order to control the conduct of any person in relation to the child); Ind. Code § 31-33-8-7(e) (providing the court *may* grant a motion to interview the child).  Because of the distinction between *must* and *may*, the legislature cannot have intended an interview with a child to be a matter of course in every assessment.  *See G.E. v. Ind. Dep't of Child Servs.*, 29 N.E.3d 769, 771 (Ind. Ct. App. 2015) (noting the term "may" "ordinarily implies a permissive condition"); *State ex rel. S. Hills Mental Health Ctr., Inc. v. Dubois Cnty.*, 446 N.E.2d 996, 1001 (Ind. Ct.

---

[16] The State asserted at oral argument that the legislature did not include an evidentiary standard within the statute for a reason.  *See* https://mycourts.in.gov/arguments/default.aspx?id=1898&view=detail (beginning at 25:30).

[17] *See supra* Section I.

App. 1983) ("The words 'must' and 'shall' are mandatory terms.").  Rather, DCS is not *required* to conduct an interview with a child as part of its assessment, and the trial court is not *required* to issue an order allowing an interview over a parent's objection.  However, the trial court *may* issue such an order *if* DCS shows good cause on the record supporting its request for an interview.

[33]   The motion seeking to compel Mother to submit her children for DCS interviews states:

> Comes now [DCS], and pursuant to Indiana Code § 31-33-8-7 and Indiana Code Chapters 31-32-13, moves the Court for a hearing on the ability to control the conduct of [Mother] and [Father] . . ., who refused an interview with the parents and the children requested by [DCS] regarding an assessment of allegations of drug abuse and domestic violence.  [Mother] and [Father] need to comply with the request of [DCS] with an interview and allow the children to be interviewed allowing the allegations of substance abuse and domestic violence to be assessed.  In support thereof, counsel for [DCS] states as follows:
> 1.  That on March 17, 2015, two additional reports[18] were received by [DCS] that may constitute an instance of child abuse and/or neglect, in that there may be substance abuse and domestic violence in the home . . . .
> 2.  That responsibility for the report was assigned to Family Case Manager Brenda Hogan after the reports were received in order to assess the children for potential abuse or neglect.
> 3.  That Brenda Hogan states that in order to complete a

---

[18] The March 2, 2015 report was addressed in the earlier Motion to Control the Conduct of [Father], seeking an interview and drug screen from Father.  Appellant's App. at 12.

thorough assessment, she would need an interview with [Mother], [Father], and the children.

* * *

5. That an order to control the conduct of [Mother] and [Father] is necessary to effectuate the goal and mission of [DCS], in order to protect the children from abuse and neglect.

Appellant's App. at 18-19.

[34] Good cause is an admittedly imprecise standard. *See Newton v. Yates*, 170 Ind. App. 486, 496, 353 N.E.2d 485, 492 (1976) (stating, in the discovery context, that "[w]hile an exact definition of good cause is somewhat elusive, it is clear that a mere allegation of need and a summary statement alleging that the information cannot be obtained from another source will not be sufficient to surmount a 'good cause' hurdle"). Nonetheless, it is the statutory standard upon which the trial court must base its decision. We are not prepared to say that a higher evidentiary threshold is constitutionally required to support an order compelling an interview, as we do not have to under the facts of this case. As in *Newton*, DCS cannot merely allege it "needs" to interview a child to "complete its assessment" and thereby show good cause. Something more is required, but nothing more was shown in this case.

[35] DCS is statutorily required to assess all reports of child abuse and neglect. Before an order can be entered overriding a parent's wishes and subjecting a child to an interview, however, DCS must show the trial court some evidence beyond a report from an undisclosed source that neglect or abuse is occurring. In other words, a report triggers an assessment, but because the assessment is

not required to include an interview with the child, the report alone does not allow DCS to conduct such an interview. Rather, if in gathering information about the items required to be included in an assessment, DCS finds some evidence supporting the allegations of the report and determines—not as a matter of course, but as a result of the circumstances of the specific case being investigated—that an interview is necessary to complete "an appropriately thorough" assessment, DCS may ask the trial court to order an interview if the parent does not consent.

[36] There was no such evidence in this case. At the hearing on DCS's motion, evidence was presented that four reports of abuse or neglect were made to DCS against Mother and Father within a month. An additional report implicating abuse or neglect was made to the probation department during this time. Three home visits were conducted by three different people as a result of those reports. Hogan made a visit to the home after the first allegation, during which she saw no evidence to support the report and classified the report as unsubstantiated. Grizzel made a visit to the home after the probation department received a report that Mother was using drugs. He saw no evidence of drug use or manufacturing in the house, no indication Mother was under the influence of drugs or alcohol, and Mother passed a drug screen. Hogan accompanied Grizzel to the home to assess the second and third reports made to DCS, but was unable to gain access to the home herself. Based upon what Grizzel told her, however, she was satisfied the children were safe. Nonetheless, DCS filed its motion to control Mother's conduct and submit her children to an interview

after this visit. Tobin visited the home after the fourth report was made. She also saw no evidence of drug use, found the home environment to be safe and appropriate, and saw no issues of concern with respect to the children. She stated that from what she saw, the accusations made in the fourth report were false. Multiple reports and multiple visits led to the same result: no evidence supporting an allegation of abuse or neglect.

[37] The State asserted at oral argument that Grizzel's testimony was sufficient to support further investigation. Grizzel learned that Mother had been regularly purchasing the maximum legal amount of pseudoephedrine. Nonetheless, Mother's purchases were within legal limits. In Grizzel's "professional opinion," the alcohol he found at Mother's home was not "old" as she claimed, but Mother did not exhibit any signs of intoxication. Tr. at 57. Grizzel did not accept the urine sample Mother provided at the home because of its color and temperature, but she later provided a supervised sample that tested clean. The State posits that Mother was being dishonest with Grizzel and it would be reasonable for the trial court to assume from his testimony, when considering the totality of the circumstances, that there was probably more going on than DCS was able to see in its home visits.[19] Whether or not it would be reasonable for the trial court to assume anything from Mother's interaction with her probation officer, the "totality of the circumstances" also include repeated

---

[19] The fact that Mother was apparently arrested for a drug-related offense in July of 2015 does not retroactively show that she was "probably" using drugs and neglecting her children in March of 2015.

reports that may have been precipitated by ulterior motives, three home visits in four weeks' time that uncovered no evidence of drug use or violence in the home, and testimony from one DCS case manager that not only was there no evidence that would support the allegations of the report, but that the allegations were untrue.

[38] The State also asserts that DCS was unable to show any such evidence *because* it was unable to interview the children. In this regard, it is important to consider the nature of the allegations. Here, the primary allegations concerned drug use, external signs of which would likely be apparent to the trained—and perhaps untrained—eye. In addition, there were allegations of physical violence between Mother and Father. Yet no official who interacted with the family saw evidence of either. There was no drug paraphernalia in or around the house, there were no visible marks from drug use or bruises from physical altercations, neither Mother nor Father ever appeared intoxicated or under the influence of drugs, and both consistently passed drug screens. No probative evidence supporting the allegations was shown on the record, and accordingly, there was no good cause to compel interviews with the Children.

[39] As in *A.H.*, we agree the procedure selected by the legislature for assessing reports of child abuse and compelling interviews with children does not necessarily violate due process. *See* 992 N.E.2d at 967. However, when the procedure is not observed, such as here where DCS did not demonstrate by *any* evidence that an interview was necessary for it to carry out its obligation to investigate reports of child abuse or neglect, the law impermissibly infringes

upon the parent's fundamental right to raise her children without undue interference by the State. Accordingly, we hold the trial court erred in issuing an order to control Mother's conduct by compelling her to submit her children to an interview by DCS.[20]

# Conclusion

[40] The statutes on which DCS based its request to control Mother's conduct by compelling her to submit the Children to interviews by DCS require DCS to show some evidence suggesting abuse or neglect before the trial court may issue such an order. No such evidence was presented to the trial court in this case, and the order issued pursuant to Indiana Code section 31-33-8-7 is reversed.

[41] Reversed.

Barnes, J., and Altice, J., concur.

---

[20] This decision does not vitiate any consent Mother gave for the Children to be interviewed following events subsequent to those specifically at issue herein.